## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:21-CR-20015-HLT** |
| **DONNIVON JONES,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Defendant Donnivon Jones is charged with possession with intent to distribute 500 grams or more of methamphetamine after a trooper stopped the vehicle he was driving and discovered over 100 pounds of methamphetamine. Defendant moves to suppress the evidence and argues that the trooper violated his Fourth Amendment rights by unlawfully prolonging the traffic stop without reasonable suspicion. Doc. 18. Defendant contends the stop became unlawful when the trooper returned his papers. Because the trooper developed reasonable suspicion of criminal activity before returning Defendant's papers, the trooper was justified in detaining Defendant until the police K-9 could arrive and perform a dog sniff of the vehicle. The Court thus denies Defendant's motion.

## I.    BACKGROUND[1]

On April 1, 2021, Defendant was driving a BMW X5 SUV with a Texas license plate in Douglas County on I-70 heading east near mile post 163. Kansas Highway Patrol ("KHP") Master Trooper Sean Taylor clocked Defendant traveling 94 miles per hour in a 75 mile per hour zone.

---

[1]    During the December 8, 2021 hearing, the Court heard testimony from KHP Master Trooper Sean Taylor and KHP Technical Trooper Kody Olson. Based on the witnesses' demeanor and attentiveness during questioning—and given that, at times, they conceded facts not helpful to the government's case—the Court credits the entirety of their testimony. But the Court relays only those portions of their testimony relevant to its resolution of the motion. The Court also admitted Government Exhibits 1-6 and Defendant Exhibit 1.

Taylor began following Defendant. Taylor also saw Defendant perform a lane change without a signal and saw that Defendant was not wearing a seat belt. It took Defendant approximately 20 seconds to pull over after Taylor activated his lights.

Taylor then approached the vehicle and told Defendant that he pulled him over for speeding, failure to signal a lane change, and failure to wear a seatbelt. Taylor asked Defendant where he was headed, what he was going to do there, and how long he was going to be there. Defendant said he was headed to Kansas City[2] from Dallas to meet and party with some people from Missouri. Defendant said he did not know how long he was staying, but "not long." Taylor saw that the vehicle was mostly empty except for what appeared to be engine coolant bottles and a backpack on the front passenger floorboard. Taylor asked about the lack of luggage. Defendant responded that it was in line with going somewhere to party and not staying long.

Taylor then asked for Defendant's driver's license, registration, and proof of insurance. The driver's license was in Defendant's name and had an address in Dallas, Texas. The registration showed that the owner of the vehicle was Nereyda Montalvo-De Castillo and that the vehicle was registered out of Edinburg, Texas. Taylor had previously lived in Texas and knew that Edinburg was located on the United States-Mexico border and that Dallas and Edinburg were "not close together." Taylor commented on the distance and asked Defendant about how the vehicle got from Edinburg to Dallas. Defendant responded that a friend in Dallas let him borrow it. Taylor then asked Defendant who let him borrow the vehicle. Defendant stated he was unable to give a name, but that the individual was from Mexico, had a Mexican name that was hard to pronounce, and

---

[2]   Defendant was not able to specify whether he was heading to Kansas City, Kansas, or to Kansas City, Missouri. Taylor testified at the suppression hearing that he often pulls over out-of-state drivers and that in his experience most of those drivers know the difference between Kansas City, Kansas, and Kansas City, Missouri.

that he just called the individual "homeboy." Defendant appeared animated and anxious, more so than what Taylor typically observes during a traffic stop.

Taylor returned to his vehicle and ran the driver's license and registration through his dispatch. Dispatch told Taylor that Defendant's driver's license was invalid.[3] Taylor testified that driving on an invalid license was an offense for which he could have taken Defendant into custody. Taylor then asked dispatch to contact the El Paso Intelligence Center ("EPIC")[4] to inquire about any border crossings of the vehicle. Taylor felt that this was warranted based on Defendant's travel plans, the vehicle coming from a border town to Kansas City to see people Defendant was not able to name, Defendant not knowing the registered owner of the vehicle, Defendant's uncertain amount of travel time, and the lack of luggage for someone that is traveling that far for an indefinite length of time. EPIC stated that the vehicle had crossed from the United States into Mexico on March 29, 2021 and crossed back into the United States on March 30. When the vehicle crossed back into the United States it was driven by someone named Isaac Montalvo.

At this point, Taylor felt he had reasonable suspicion to believe there were narcotics in the vehicle. Taylor then asked KHP Technical Trooper Kody Olson to bring his K-9, Police Service Dog Garp, to perform a dog sniff of the vehicle. Taylor explained to Olson that he was going to have Defendant remain on scene until the K-9 could arrive. Taylor walked back to the BMW and gave Defendant his license, insurance, registration, and several citations. Taylor told Defendant that he would have to appear in Douglas County on May 7, told Defendant to "be careful," and began to walk away. Defendant then asked Taylor a question about the citations, so Taylor

---

[3]   Taylor testified that Texas designates driver's licenses as "eligible" for valid and "not eligible" for invalid. Dispatch informed Taylor that Defendant's driver's license was listed as "not eligible." Taylor testified that dispatch can further inquire about why a driver's license is listed as "not eligible," but that he did not ask dispatch for any additional information.

[4]   EPIC provides "information on criminal history and border crossings," which the Tenth Circuit has "found relevant to an officer's drug trafficking suspicions." *United States v. Morales*, 961 F.3d 1086, 1092 (10th Cir. 2020).

reapproached the vehicle. Taylor told Defendant he would have to call and ask the court his question. Taylor then asked Defendant if he had anything illegal in the vehicle and if he could search the vehicle. Defendant responded that he did not have anything illegal in the vehicle and that he was not giving consent to search. Taylor then informed Defendant that he was going to detain him until a police K-9 could arrive and that the K-9 was already on the way so it would not take long. Taylor testified that he had reasonable suspicion of illegal narcotics in the vehicle when he returned the papers based on Defendant's travel plans, his not knowing the registered owner's name, the unknown amount of time in his destination location, the lack of clothing, the recent border crossing, and the location of the vehicle in Kansas two days after crossing the border.

Approximately 15 minutes later, Olson and PSD Garp arrived on the scene. Olson checked Defendant for weapons and found none. Olson then asked Defendant to stand to the side. PSD Garp alerted to the odor of narcotics at the back of the vehicle's rear hatch seam. After the alert, Taylor put handcuffs on Defendant and put him in the front seat of his patrol car. Taylor, Olson, and a third officer then searched the vehicle for approximately 40 minutes. Upon lifting the back seat, Taylor found a metal plate with automotive putty consistent with a post-manufactured compartment. Underneath the vehicle, Taylor observed putty on the driver's side and some fingerprints on the rocker panel, which also indicated a potential compartment that had been added to the vehicle. The troopers took the vehicle to a garage in Topeka to get the vehicle onto a lift. Officers discovered two compartments underneath the rocker panel area while the vehicle was on the lift. Officers found 50 packages containing 112 pounds of methamphetamine in the compartments.

A grand jury later indicted Defendant for possession of methamphetamine with intent to distribute under 21 U.S.C. § 841. Defendant now moves to suppress all evidence obtained from the traffic stop and subsequent search.

## II.   ANALYSIS

Defendant does not challenge the lawfulness of the initial stop or the duration of the stop from when it was initiated until Taylor returns his papers. Defendant only argues that the traffic stop was unlawfully prolonged without reasonable suspicion or voluntary consent after Taylor returned his papers. Defendant argues the proper remedy for this Fourth Amendment violation is suppression of all evidence obtained after Taylor returned his papers. The government disagrees and argues that the stop was not unlawfully prolonged because Taylor had developed reasonable suspicion of drug trafficking by the time he returned Defendant's papers.[5]

An officer's authority to seize the occupants of a vehicle ends when "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). An officer may not constitutionally prolong a stop beyond that point unless: (1) the officer has independent reasonable suspicion of criminal wrongdoing on behalf of the seized individual that justifies further investigation, or (2) the seized individual consents. *United States v. Cortez*, 965 F.3d 827, 833 (10th Cir. 2020).

The Court starts with reasonable suspicion. "Reasonable suspicion accrues when an officer possesses a particularized and objective basis for suspecting criminal conduct under a totality of the circumstances." *Id*. at 834 (quotation omitted). This is not an onerous standard. *Id*. The

---

[5] The government additionally argues that Defendant voluntarily consented to the encounter, that Taylor had probable cause to arrest Defendant because Defendant was driving without a valid driver's license, and that Taylor had reasonable suspicion to believe that the vehicle was stolen. Because the Court finds Taylor had reasonable suspicion of drug trafficking when he returned Defendant's papers, the Court need not address all the remaining arguments. Indeed, the parties agree that the Court need not analyze whether the encounter was consensual if the Court finds that Taylor had developed reasonable suspicion when he returned Defendant's papers.

government bears the burden of demonstrating the reasonableness of the suspicion, but it requires "considerably less" than a preponderance of the evidence and "obviously less" than probable cause. *Id*. Reasonable suspicion does not require the officer to rule out the possibility of innocent conduct, and the Court defers to an officer's training and ability to discern innocent conduct from suspicious behavior in assessing reasonable suspicion. *Id*.

Here, the Court finds that based on the totality of the circumstances Taylor developed reasonable suspicion of drug trafficking by the time he returned Defendant's papers. It took Defendant approximately 20 seconds to pull over after Taylor activated his lights, which Taylor testified was longer than normal based on his experience.[6] Although Defendant eventually pulled over and fully complied with Taylor's commands, Defendant's initial hesitancy remains a factor for consideration. *Cf. United States v. King*, 2011 WL 4842555, at *5 (D. Utah 2011) (stating that taking thirty seconds to pull over was sufficiently lengthy for officer to be concerned that vehicle was not going to pull over and supported a finding of probable cause to search the vehicle).

The information Taylor gathered during his initial encounter with Defendant and the vehicle further developed reasonable suspicion. When asked about his travel plans and the vehicle's ownership, Defendant gave vague and evasive answers. Defendant said he was headed from Dallas to Kansas City but was unable to specify whether his destination was in Kansas or Missouri. Defendant said he was going to party with "some people from Missouri" but that he did not know how long he was going to stay. When asked about how the vehicle got from Edinburg to Dallas, Defendant stated that a friend in Dallas let him borrow it. Defendant was unable to give the owner's name and stated that he just called the individual "homeboy." And Taylor observed

---

[6]   Taylor has 18 years of experience with the KHP, and his primary assignment is to patrol the Kansas Turnpike. He is a Master Trooper. Taylor's training includes a 22-week academy, 50 days of on-the-job training with a field training officer, a 40-hour class on advanced criminal interdiction, a 40-hour conference on drug interdiction assistance, and 40 hours of continuing education every year to maintain his law enforcement certification.

no luggage besides a single backpack in the vehicle, which Taylor believed was unusual for someone traveling that far. These facts all contribute to reasonable suspicion. *See United States v. Ludwig*, 641 F.3d 1243, 1249 (10th Cir. 2011) (stating that driving a vehicle registered to a third-party who is not present may indicate drug trafficking); *United States v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010) (stating that the Tenth Circuit has found "vague, inconsistent or evasive answers with respect to travel plans supportive of reasonable suspicion"); *United States v. Ledesma*, 447 F.3d 1307, 1318 (10th Cir. 2006) (finding that the inconsistency between a small amount of luggage and the stated travel plans is a factor in a reasonable suspicion analysis).

And the information Taylor received from dispatch further developed reasonable suspicion. Dispatch informed Taylor that Defendant's driver's license was invalid. The vehicle was registered in a city near the border, which is not inconsistent with an innocent explanation, but contributes to the reasonableness of suspecting drug trafficking. *See Cortez*, 965 F.3d at 835. EPIC stated that the vehicle had crossed from the United States into Mexico on March 29 and back into the United States again on March 30. When the vehicle crossed back into the United States it was driven by a third party who was neither the vehicle's registered owner nor the person currently driving the vehicle. And the vehicle was several hundred miles from the border when the stop occurred on April 1. These facts further contribute to reasonable suspicion. *See United States v. Gandara-Salinas*, 327 F.3d 1127, 1131 (10th Cir. 2003) (finding that the officer's knowledge that the defendant's vehicle had crossed the United States-Mexico border the previous day contributed to the officer's reasonable suspicion of drug trafficking).

And, finally, Defendant appeared animated and anxious when questioned, more so than what Taylor typically observes during a traffic stop. The Court acknowledges that nervousness does not alone generate reasonable suspicion because "it is common for most people to exhibit

signs of nervousness when confronted by a law enforcement officer whether or not the person is currently engaged in criminal activity." *Cortez*, 965 F.3d at 835 (quotation omitted). But here, Defendant's nervousness was suspicious because it was accompanied by vague and evasive answers to routine questions about travel plans and the vehicle's ownership. Accordingly, Defendant's abnormal reactions to his encounter with Taylor contribute to reasonable suspicion. *See id*. at 835-36. Thus, after considering the totality of the circumstances, the Court finds that Taylor developed reasonable suspicion of drug trafficking by the time he returned Defendant's papers.

Defendant responds that his travel plans were not in and of themselves enough to establish reasonable suspicion because he did not give any false or inconsistent statements. Defendant also argues that there were other innocent explanations for the border crossings, that no facts suggest Defendant crossed the border, and that there was nothing in plain view and no odor emanating from the vehicle to suggest any narcotics were in the vehicle.

But the possibility of an innocent explanation for suspicious circumstances or the lack of other facts suggesting narcotics trafficking does not render the detention unconstitutional. *See United States v. Williams*, 7 F. App'x 876, 884 (10th Cir. 2001). Defendant's arguments also ignore that the analysis is based on the totality of the circumstances. Each of these facts, taken alone, might not provide an officer with a reasonable suspicion of criminal activity. But together they easily support a finding that Taylor developed reasonable suspicion of drug trafficking by the time he returned Defendant's papers. And because Taylor had developed reasonable suspicion, he was justified in prolonging the encounter for a police K-9 to arrive on the facts of this case.[7]

---

[7]   While the Court need not go further, even if the Court's reasonable-suspicion ruling is incorrect, the Court would deny the motion. Taylor had probable cause to arrest Defendant for driving without a valid driver's license, which is an arrestable offense under Kansas law. Taylor ran Defendant's driver's license through his dispatch and was informed that Defendant's Texas driver's license was "not eligible." Defendant suggests that "not eligible" could

For these reasons, the Court finds that the encounter did not violate Defendant's Fourth Amendment rights. The Court denies the motion.[8]

## III.    CONCLUSION

The Court carefully considered the record and arguments. The Court finds that Taylor had reasonable suspicion of narcotics trafficking when he returned Defendant's papers based on the totality of the circumstances.

THE COURT THEREFORE ORDERS that Defendant's Motion to Suppress (Doc. 18) is DENIED.

IT IS SO ORDERED.

Dated: December 27, 2021                             /s/ *Holly L. Teeter*
                                                    HOLLY L. TEETER
                                                    UNITED STATES DISTRICT JUDGE

---

mean something other than "invalid." But Taylor testified that he understood "not eligible" to mean "invalid" and that he believed he had probable cause to arrest Defendant for this offense. And there is no evidence showing that Defendant's license was valid when he was stopped or that "not eligible" means anything other than "invalid." Accordingly, the Court credits Taylor's testimony on this issue. *See United States v. Sanchez*, 2011 WL 6091744, at *5 (D. Kan. 2011) (finding that trooper had probable cause to arrest the defendant when he learned the defendant was driving on a suspended license); *Simpson v. Kansas*, 593 F. App'x 790, 795 (10th Cir. 2014) (holding that the Fourth Amendment was not violated when trooper issued a citation for seatbelt violation and began to leave before deciding to arrest the defendant because seatbelt violation was arrestable offense under Kansas law and the trooper did not need "new" probable cause for the arrest). Defendant did not address this issue in his brief, but the Court granted his counsel's request to file a supplemental brief by 5:00 on December 17, 2021. Supplemental briefing was not filed. Based on the facts and law before the Court, the Court finds that the motion to suppress could alternatively be denied based on Taylor's probable cause to arrest Defendant, which rendered him lawfully detained when PSD Garp alerted.

[8]    Although not specifically challenged by Defendant, the Court finds the rest of the encounter consistent with the Fourth Amendment. PSD Garp arrived about 15 minutes after Taylor returned Defendant's papers, which is a reasonable amount of time. PSD Garp alerted to a specific spot on the vehicle, which gave the troopers probable cause to search the vehicle. There are no challenges to PSD Garp's certifications. During the search, the troopers discovered a metal plate, automotive putty, and fingerprints in an unusual location. These facts indicated that post-manufactured compartments had been added to the vehicle. This gave the troopers probable cause to seize the vehicle and to search the hidden compartments. Ultimately, the troopers located hidden compartments and over 100 pounds of methamphetamine later that day.